Filed 12/15/14  P. v. Najdawi CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>TEYSEER ZAID NAJDAWI,<br><br>        Defendant and Appellant. | A135699<br><br>(San Mateo County<br>Super. Ct. No. SC068726A) |

Defendant Teyseer Zaid Najdawi shot his best friend at close range, 11 times in the head.  While in jail, awaiting trial for murder, defendant brutally attacked his cellmate, nearly killing him.  Defendant pleaded not guilty and not guilty by reason of insanity.  A jury convicted defendant of first degree murder regarding the shooting death of his friend and found true the firearm and great bodily injury enhancements.  The jury also convicted defendant of attempted murder and assault with great bodily injury regarding the attack of his cellmate.  The trial court determined that defendant was sane[1] at the time the crimes were committed and sentenced him to a seven-year term for the attempted murder count, to be served consecutive to a term of 50 years-to-life on the murder count.  Defendant appeals raising numerous claims of error, including instructional errors, prosecutorial misconduct, ineffective assistance of counsel, and sentencing error.  We affirm.

---

[1]     Defendant waived his right to a jury at the sanity phase of the proceedings and agreed that the trial court could decide the issue of his sanity based on the medical reports.

1

# I. BACKGROUND

## A.  *Murder of Jack Chu*

At some time prior to the killing, defendant purchased a .40 caliber Glock handgun in Reno, Nevada.  Defendant had put a laser sight on the gun to help him aim.  Defendant acted like a tough guy and carried the gun around with him all of the time.  Defendant was a braggart, who made grandiose statements about himself.  He claimed he was a bounty hunter even though his friends knew he was not.

Defendant also claimed that someone was trying to kill him.  Defendant, however, was never able to articulate what prompted him to think that someone was trying to kill him.  Nevertheless, he consistently claimed that someone was trying to kill him regardless of whether he was under the influence of drugs/alcohol or sober.  People close to defendant believed he was paranoid.

On July 7, 2008, defendant went out drinking in San Francisco with his best friend, Jack Chu.  A mutual friend, Gray Byun, met up with the men at The Bottom's Up bar, where they drank together for about an hour and a half.  Defendant used his brother's credit card to buy drinks for the group and laughed about using the card without his permission.  Byun could see that defendant was carrying a .40 caliber Glock handgun that night, which was the same gun that defendant had purchased in Reno, Nevada and had brandished at a bachelor party several weeks before.

Around 10:00 or 10:30 p.m., defendant and Chu left the bar and went to the Dragon Lounge.  Byun had to work the next morning, so he went home.  Defendant and Chu had a few more drinks at the Dragon Lounge, where the bartender described defendant as being "very loud" and "annoying."  At one point, the bar manager had to intervene.  Chu apologized for defendant's behavior and explained to the bartender that defendant had just "popped some [V]icodin."  While at the bar, Chu and defendant called their friend, Eric Brewer, on the telephone.  Both Chu and defendant talked to Brewer about Darryl Harvey, another friend of theirs who had taken some of Chu's marijuana.  Chu told Brewer he wanted to "beat [Harvey's] ass."  Defendant repeatedly said that he wanted to "put a bullet" in Harvey.  Brewer did not take Chu or defendant seriously.  He

2

just thought his friends were drunk; he could not imagine either of them actually getting violent.  Brewer invited Chu and defendant over to his apartment in Millbrae, but he never got an actual answer about whether they would come by that night.

Defendant and Chu left the Dragon Lounge around 1:00 a.m.  Surveillance footage from a store down the street from the Dragon Lounge showed the men outside the bar, with defendant walking drunkenly behind Chu with a gun in his hand; the red beam of the laser sight visible in the video.

Around 1:30 a.m., Brewer saw Chu's car pull up outside of his apartment on Lincoln Circle in Millbrae.  The car sat there for about five minutes with no one getting out of it.  Brewer then heard at least six gunshots but saw no movement in the car.  He thought that defendant and Chu were "just messing around," shooting the gun.  About a minute later, Brewer saw Chu's car drive away down an alley.

Breanna Benson was outside an apartment on Lincoln Circle around 1:30 a.m., talking on the phone with her boyfriend.  She saw a white car pull to an abrupt stop on the street.  While she was talking on the phone, she heard about eight "firecracker" sounds from the car and saw flashes from the passenger seat of the car.  She also heard the metallic clicking of shell casings falling on the street by the front passenger window, and saw a red laser on the building across the street.  Benson saw the passenger get of the car, walk around to the driver's side, open the door and push what appeared to be a person over to the passenger's side.  The passenger then got in the car and drove off down the alley.

Several other people heard gunshots on Lincoln Avenue on the night of the murder.  Rosemary Alva heard at least five gunshots outside.  She looked outside and saw a white car in the street with its headlights on and the passenger door open.  Domingo Loniza heard about eight gunshots from the street and then tires screeching.  After the police arrived, Loniza inspected the apartment for damage and found a bullet lodged in the back window about two feet from where he had been in bed.  Valeraiy Pashchenko heard four to five gunshots in rapid succession.  He found a bullet hole in the wall of his bedroom.

3

The 911 dispatcher began receiving calls about gunshots being fired on Lincoln Circle at 1:39 a.m., and the first officer responded on the scene by 1:41 a.m. Officers found six bullets and six shell casings at the scene, as well as what was later identified as Chu's blood and brain matter in the street.

Meanwhile, defendant drove Chu's car to a residential neighborhood in Burlingame and parked the car about a mile from defendant's mother's house. He left Chu's dead body in the car and went to his mother's house. Defendant's brother, Tarik, heard defendant making loud "banging" noises and confronted defendant. Defendant challenged Tarik to fight, gesturing at him and putting his hand in his coat. Tarik retreated to his room.

Defendant's mother also got up and confronted defendant about the noise he was making. She noticed that defendant had blood on his face, hands, and clothes. Defendant told her that he had gotten in a fight with "some Filipinos" in the parking lot of a bar. He also told his mother that he and Chu did not leave the bar together, explaining that the two had "split up," with defendant taking the train home.

Chu's friends and family became concerned when he did not come home that night, and they went to The Bottom's Up and the Dragon Lounge the next day seeking information on his whereabouts. At the Dragon Lounge, they found out that Chu had been there with defendant the previous night. Chu's family called defendant's mother, hoping to talk to defendant. Defendant was not home at the time; after his mother told him that the Chus had called, defendant left town.

On July 10, 2008, a man on his morning walk noticed a dead body slumped over in a car. The man saw "blood streaming" from the car door, "a hole in the window," and "flies all over the body." Officers called to the scene noted that the body was "in the early stages of decomposition," just "beginning to rot," and "there was maggot infestation of the body." The body was identified as Chu.

Informed that Chu had last been seen with defendant, officers went to defendant's mother's house. There, they retrieved defendant's clothes from the night of the murder, including his jeans and jacket, which were covered with Chu's blood. In a storage locker

4

in the garage, they also recovered a box for a laser sight, gun cleaning supplies, and an envelope with two spent shell casings from defendant's gun that matched the 12 shell casings found at the murder scene and in Chu's car. The serial number on the envelope also matched paperwork from the Nevada gun shop where defendant had purchased his .40 caliber Glock.

Following Chu's murder, defendant spent some time in Redding, where he met John Sparks. The men spent about five days together before defendant was arrested in connection with Chu's death. During that time, Sparks saw defendant cleaning a black, .40 caliber Glock handgun with a bandanna. Sparks noted that defendant was careful to handle the gun only with the bandanna and not touch it with his hands. Defendant mentioned to Sparks that things had gotten "a little heated" in the Bay Area, and that defendant needed to "get rid of some car keys." Defendant suggested that they go for a walk by the river, during which defendant stopped on a bridge and leaned over towards the water. They turned around and returned to defendant's motel room; Sparks never saw the gun or the keys again. Defendant was arrested in Redding soon thereafter; officers were unable to locate his gun.

A pathologist testified that Chu was shot 11 times in the head, with nine bullets penetrating his head from the right side, one grazing his nose, and one grazing the left side of his head. The majority of the entrance wounds had powder burns, indicating that Chu was shot from a close range. This was consistent with "an individual seated in the passenger's side of a vehicle and simply blasting away firing his weapon repeatedly at the side of the driver's head." There were no other injuries on Chu to suggest that he and defendant had fought before he was shot.

## B.     *Attempted Murder of John Lynch*

In September 2008, defendant shared a two-man cell at the San Mateo County Jail with John Lynch. For the first few days of their time as cellmates, Lynch "had no problems with" defendant. However, one night, defendant mentioned "something about some disrespect and something had happened in Millbrae." Lynch told defendant he did not want to discuss defendant's case. At one point, defendant "started making robotic

5

noises" and "moving his hands up and down through the cell." The next morning, Lynch got up to use the bathroom. On his way to the toilet, Lynch was attacked by defendant. Defendant hit Lynch, wrapped his arm around Lynch's neck, and pulled him to the ground. Lynch hit his head against the urinal, and defendant put him in a headlock, punching the back of Lynch's head and choking him. Lynch began to lose consciousness and awoke only when two officers rushed in and pulled defendant off him. Lynch appeared "lifeless" after the attack and was "hardly breathing." He suffered a number of head injuries and "had bruises all over." An attending officer thought Lynch might die overnight. Lynch suffered short-term and long-term memory loss and stated that his "whole life has changed" as a result of the attack.

## II. DISCUSSION

### A.     *Instruction on Voluntary Manslaughter*

Defendant contends that the trial court should have instructed the jury on voluntary manslaughter, either on the theory that Chu's death was an unintentional killing without malice, during the commission of a felony assault with a deadly weapon, as described in *People v. Garcia* (2008) 162 Cal.App.4th 18, 31 (*Garcia*), or based on imperfect self-defense (CALCRIM No. 571). However, the California Supreme Court overruled *Garcia* to the extent it recognized a killing without malice during an inherently dangerous assaultive felony as a third variety of voluntary manslaughter (*People v. Bryant* (2013) 56 Cal.4th 959, 964). Recently the court has also held that imperfect or unreasonable self-defense cannot be based solely on a defendant's delusions (*People v. Elmore* (2014) 59 Cal.4th 121,129-130 (*Elmore*)).

#### 1.     *Background*

Prior to closing arguments, defense counsel requested the trial court to instruct the jury with CALCRIM No. 571, the imperfect self-defense voluntary manslaughter instruction. Defense counsel argued that the instruction was warranted because "there has been evidence that raises a question of imperfect self-defense," including testimony from several witnesses purportedly showing that defendant was delusional and carried a gun because he thought "people were trying to kill him." In opposition, the prosecutor

6

argued that "[n]either imperfect self-defense nor heat of passion can reduce what would otherwise be a murder to manslaughter where the provocation, or perceived necessity to defend is predicated on delusions and/or hallucinations." Specifically, the prosecutor, citing *People v. Mejia-Lenares* (2006) 135 Cal.App.4th 1437, 1461 (*Mejia-Lenares*), argued an imperfect self-defense theory of manslaughter cannot be based solely on the defendant's delusions because the defense is limited to an unreasonable misinterpretation of facts as they actually exist, while a delusion is a " 'perception of facts not grounded in reality.' " (*Mejia-Lenares, supra,* 135 Cal.App.4th at p. 1453.) The prosecutor also noted that, even if imperfect self-defense could, in theory, be based solely on a delusion, "there's absolutely no objective evidence of any sort of actual provocation or actual danger in this record" to support the instruction.

The trial court refused to instruct the jury on voluntary manslaughter, explaining that defendant's alleged "paranoid delusion" that some "amorphous or vague group of people" was after him did not warrant a manslaughter instruction where there was "no evidence" of any "actual provocation or danger from [the victim]."

2.      *Applicable Law*

"California statutes have long separated criminal homicide into two classes, the greater offense of murder and the lesser included offense of manslaughter. The distinguishing feature is that murder includes, but manslaughter lacks, the element of malice. [Citations.]" (*People v. Rios* (2000) 23 Cal.4th 450, 460.) Penal Code[2] "[s]ection 192 establishes three kinds of manslaughter: voluntary, involuntary, and vehicular. Only voluntary manslaughter is at issue here. Punishment is mitigated for this offense, which the law deems less blameworthy than murder because of the attendant circumstances and their impact on the defendant's mental state. Two factors may preclude the formation of malice and reduce murder to voluntary manslaughter: heat of passion and unreasonable self-defense. (*People v. Beltran* [(2013)] 56 Cal.4th 935, 942, 951; *People v. Blakeley* (2000) 23 Cal.4th 82, 87-88.) Heat of passion is recognized by

---

[2]      All further undesignated statutory references are to the Penal Code.

7

statute as a mitigating factor. (§ 192, subd. (a).) Unreasonable self-defense is founded on both statute and the common law. (*People v. Anderson* (2002) 28 Cal.4th 767, 782.)" (*Elmore, supra,* 59 Cal.4th at p. 133.)

Here, defendant, relying on *Garcia*, *supra,* 162 Cal.App.4th 18, invites us to consider a third type of voluntary manslaughter, to wit: a killing committed in the course of an inherently dangerous assaultive felony. Defendant's reliance on *Garcia* is misplaced. Recently, in *Bryant, supra,* 56 Cal.4th 959, our Supreme Court expressly disapproved *Garcia,* to the extent it suggests that a killing without malice in the commission of an inherently dangerous assaultive felony constitutes voluntary manslaughter. (*Bryant, supra,* 56 Cal.4th at p. 970.) In so holding, the Court explained that "the offenses that constitute voluntary manslaughter—a killing upon a sudden quarrel or heat of passion (§ 192, subd. (a)), a killing in unreasonable self-defense [citation], and, formerly, a killing committed by one with diminished capacity [citation]—are united by the principle that when a defendant acts with an intent to kill or a conscious disregard for life (i.e., the mental state ordinarily sufficient to constitute malice aforethought), other circumstances relating to the defendant's mental state may preclude the jury from finding that the defendant acted with malice aforethought. But in all of these circumstances, a defendant convicted of voluntary manslaughter has acted either with an intent to kill or with conscious disregard for life." (*Bryant, supra,* 56 Cal.4th at pp. 969-970.) However, "[a] defendant who has killed without malice in the commission of an inherently dangerous assaultive felony must have killed without either an intent to kill or a conscious disregard for life. Such a killing cannot be voluntary manslaughter because voluntary manslaughter requires either an intent to kill or a conscious disregard for life." (*Id.* at p. 970.)

After the instant appeal was fully briefed, our Supreme Court rendered its decision in *Elmore*, in which the Court, after thoroughly reviewing the law of murder and manslaughter and the evolution of unreasonable self-defense, held that unreasonable self-defense is not available when the belief in the need to defend oneself is purely delusional. (*Elmore, supra,* 59 Cal.4th at pp. 129-130, 132-139.) In so holding, the court explained

8

that "unreasonable self-defense involves a mistake of *fact.* (*In re Christian S.* (1994) 7 Cal.4th 768, 779, fn. 3 (*Christian S.*).) A purely delusional belief in the need to act in self-defense may be raised as a defense, but that defense is insanity. Under our statutory scheme, a claim of insanity is reserved for a separate phase of trial. At a trial on the question of guilt, the defendant may not claim self-defense based on insane delusion." (*Elmore*, *supra*, 59 Cal.4th at p. 130.)

In *Elmore,* the court expressly approved *Mejia-Lenares, supra,* 135 Cal.App.4th 1437, which holds that purely delusional acts are excluded from the scope of unreasonable self-defense. (*Elmore, supra,* 59 Cal.4th at p. 136.) "*Mejia-Lenares* reasoned that because unreasonable self-defense is a 'species of mistake of fact [citation] . . . it cannot be founded on delusion. In our view, a mistake of fact is predicated upon a negligent perception of facts, not, as in the case of a delusion, a perception of facts not grounded in reality. A person acting under a delusion is not negligently interpreting actual facts; instead, he or she is out of touch with reality.' (*Mejia-Lenares, supra,* 135 Cal.App.4th pp. 1453-1454.)" (*Elmore, supra,* 59 Cal.4th at p. 136, fn. omitted.)

Agreeing with the *Mejia-Lenares* court, *Elmore* concluded that unreasonable self-defense "has no application when the defendant's actions are entirely delusional. A defendant who makes a factual mistake misperceives the objective circumstances. A delusional defendant holds a belief that is divorced from the circumstances. The line between mere misperception and delusion is drawn at the absence of an objective correlate. A person who sees a stick and thinks it is a snake is mistaken, but that misinterpretation is not delusional. One who sees a snake where there is nothing snakelike, however, is deluded. Unreasonable self-defense was never intended to encompass reactions to threats that exist only in the defendant's mind." (*Elmore, supra,* 59 Cal.4th at pp. 136-137.)

3. *Analysis*

When a defendant is charged with murder, the trial court has a sua sponte duty to instruct the jury on a lesser included offense where "substantial evidence" is adduced at trial to support the lesser charge. (*People v. Stitely* (2005) 35 Ca1.4th 514, 551.)

9

Specifically, an instruction on imperfect self-defense is warranted "whenever the evidence is such that a jury could reasonably conclude that the defendant killed the victim in the unreasonable but good faith belief in having to act in self-defense." (*People v. Barton* (1995) 12 Cal.4th 186, 201 (*Barton*).)  "This does not mean, however, that trial courts must instruct sua sponte on unreasonable self-defense in every murder case." (*Ibid.*) Rather, "the need to do so arises only when there is substantial evidence that the defendant killed in unreasonable self-defense, not when the evidence is 'minimal and insubstantial.' " (*Ibid.,* fn. omitted.)

Here, the trial court had no duty to sua sponte instruct the jury on the purported "third" variety of voluntary manslaughter described in *Garcia, supra,* 162 Cal.App.4th at page 31 because as discussed *ante* (see § II.A.2), our Supreme Court has held, it does not exist.  (*Bryant, supra,* 56 Cal.4th at p. 970.)  In so holding, the Court made clear that it had "never suggested that [voluntary manslaughter] could be committed without either an intent to kill or a conscious disregard for life," and thus, *Garcia's* creation of a third variety of "assaultive" manslaughter without malice was without legal support.  (*Id.* at pp. 969-970.)  Inasmuch as the trial court did not have a sua sponte duty to instruct on a theory of manslaughter which our Supreme Court has found not to exist, the trial court did not err by failing to instruct on this form of manslaughter.

Equally unavailing is defendant's contention that the trial court had a duty to instruct on a theory of imperfect or unreasonable self-defense.  There was no evidence whatsoever, let alone substantial evidence, of any objective circumstances that defendant "acted under an unreasonable *mistake of fact—*that is, the need to defend himself against imminent peril of death or great bodily injury." (*Christian S., supra,* 7 Cal.4th at p. 779, fn. 3, italics added.)  Rather, defendant claims his request for an instruction on imperfect self-defense should have been granted, even though his perception of a threat was entirely delusional.  This claim fails as a matter of law.  As *Elmore* explains, "California cases reflect the understanding that unreasonable self-defense involves a misperception of objective circumstances, not a reaction produced by mental disturbance alone.  And the statutory scheme, though it permits evidence of mental illness to show that the defendant

10

did not harbor malice, reserves the issue of legal insanity for a separate phase of trial . . . [A] belief in the need for self-defense that is purely delusional is a paradigmatic example of legal insanity." (*Elmore, supra,* 59 Cal.4th at pp. 134-135.)

Defendant argues his case is analogous to *People v. Wells* (1949) 33 Cal.2d 330 (*Wells*) and that he was entitled to an unreasonable self-defense instruction. Like the defendant in *Elmore,* defendant here misreads *Wells*. (*Elmore, supra,* 59 Cal.4th at pp. 137-138.) "*Wells* was not a homicide case but the prosecution of a prison inmate for assault with malice aforethought . . . (*Wells,* at p. 334.) Wells had been ejected from a disciplinary hearing for disrupting the proceedings. In the hall outside, he encountered the guard who had brought charges against him. Wells 'seized a heavy crockery cuspidor and threw it' at the guard, severely injuring him. (*Id.* at p. 338.) "**Wells testified that he had no intent to hit the guard, but only picked up the cuspidor to defend himself from another guard who struck him with a baton. The blow caused him to fall and release the cuspidor. (*Wells, supra,* 33 Cal.2d at p. 339.) The defense also offered testimony from prison physicians that Wells suffered from an abnormal physical and mental condition, not amounting to insanity. According to the doctors, he was in a state of tension that rendered him highly sensitive to external stimuli and abnormally fearful for his personal safety. As a result, he reacted to apparent threats more violently and unpredictably than an average person would. (*Id.* at pp. 344-345.) [The California Supreme Court] reasoned that if Wells had 'acted only under the influence of fear of bodily harm, in the belief, honest though unreasonable, that he was defending himself from such harm by the use of a necessary amount of force, then . . . the essential element of "malice aforethought" would be lacking.' (*Id.* at p. 345 . . .)" (*Elmore, supra,* 59 Cal.4th at p. 137.)

Defendant cites *Wells* for the proposition that "a state of paranoia coupled with an external stimuli—as opposed to a delusion alone—will support a defense of unreasonable self-defense." His reliance on *Wells* is misplaced. Unlike in the instant case, "Wells held a 'belief which, although skewed by mental illness, was nevertheless factually based.' (*Mejia-Lenares, supra,* 135 Cal.App.4th at p. 1449.) There was no evidence that Wells's perception of a threat was delusional. To the contrary, he claimed his actions were an

11

attempt to defend himself from an actual baton-wielding guard. (*Wells, supra,* 33 Cal.2d at p. 339.) The expert testimony was that Wells was abnormally sensitive to external stimuli. (*Id.* at pp. 344-345, [italics omitted].) *Wells* does not support [the] claim that unreasonable self-defense requires no objective basis." (*Elmore, supra,* 54 Cal.4th at pp. 137-138.) Here, unlike in *Wells,* there is no evidence that defendant's belief in the need to defend himself was factually based.

Inasmuch as "purely delusional perceptions of threats to personal safety cannot be relied upon to claim unreasonable self-defense" (*Elmore, supra,* 59 Cal.4th at pp. 138-139), the trial court did not err in refusing to instruct the jury with this theory.

Accordingly, the trial court did not err in refusing to instruct the jury on voluntary manslaughter.

## B.    *Instruction on Malice*

Although we have rejected defendant's predicate contention that the jury should have been instructed with CALCRIM No. 571, we also address his specific claim that the jury should have been instructed that the prosecution was required to prove beyond a reasonable doubt that defendant was not acting in unreasonable self-defense.

Defendant contends that without the last portion of CALJIC No. 571 being given, the jury was given an incomplete definition of malice. This derivate claim necessarily fails.

The jury was instructed with CALCRIM No. 520, which explains that there "are two kinds of malice aforethought, express malice and implied malice[,]" which it defines as follows: "The defendant acted with express malice if he unlawfully intended to kill. [¶] The defendant acted with implied malice if: [¶] 1. He intentionally committed an act; [¶] 2. The natural and probable consequences of the act were dangerous to human life; [¶] 3. At the time he acted, he knew his act was dangerous to human life; [¶] AND [¶] 4. He deliberately acted with conscious disregard for human life." (CALCRIM No. 520.) The instruction further specified that "[m]alice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes

12

death is committed. It does not require deliberation or the passage of any particular period of time."

For the first time on appeal, defendant maintains that this definition is incomplete and that jury should have also been instructed with the last sentence of CALCRIM No. 571, to wit: "The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in (imperfect self-defense/ [or] imperfect defense of another). If the People have not met this burden, you must find the defendant not guilty of murder."

Even exercising our discretion and addressing this otherwise forfeited claim, it nevertheless utterly fails on the merits. (See *People v. Williams* (1998) 17 Cal.4th 148, 161-162, fn. 6.) It stands to reason that if the trial court had no duty to instruct with CALCRIM No. 571 in its entirety, it certainly had no duty to instruct with its last sentence. Even assuming for the sake of argument that defendant's claim had some plausible merit, there is absolutely no evidence in the record that defendant was acting in self-defense. Defendant never made a statement to the police, he also did not testify at trial or present any evidence that the victim was out to get him. Rather, the scant evidence upon which defendant relies to support his theory of imperfect self-defense is generic testimony from friends and family that defendant was paranoid and carried a gun because he thought "someone" was trying to kill him. Faced with a complete absence of evidence of imperfect self-defense, the trial court was not obligated to instruct with CALCRIM No. 571 or any portion of it.

Finally, CALCRIM No. 520 has repeatedly been upheld as "adequately inform[ing] the jury" of the law of murder and the prosecution's burden regarding malice. (See, e.g., *People v. Canizalez* (2011) 197 Cal.App.4th 832, 857.) The instruction explains that the prosecution has the burden of proving that the defendant acted with express malice, because he "unlawfully intended to kill," or implied malice because: "(1) He intentionally committed an act; [¶] (2) The natural and probable consequences of the act were dangerous to human life; [¶] (3) At the time he acted, he knew his act was dangerous to human life; [¶] AND [¶] (4) He deliberately acted with conscious disregard

13

for human life." Moreover, CALCRIM Nos. 220 and 521, both of which were given, further explain the prosecution's burden to prove the defendant's guilt beyond a reasonable doubt. Because there was no evidence supporting an instruction on imperfect self-defense, and the instructions given clearly and fully explained the prosecution's duty to prove defendant's guilt beyond a reasonable doubt, the trial court was not required to instruct the jury with the last line of CALCRIM No. 571.

Accordingly, we reject defendant's subsidiary claim that the instructions as given impaired his defense.

## C.      *Instruction on Hallucinations*

Defendant next contends the trial court erred by not instructing with CALCRIM No. 627 or a similar instruction telling the jury that an unreasonable, subjective delusion could negate premeditation and deliberation. Defendant argues the court's failure to instruct the jury was prejudicial because the instruction would have allowed the jury to find the premeditation allegation was not true.

At the hearing on the proposed jury instructions, the prosecutor, not defense counsel, had originally proposed giving CALCRIM No. 627. However, following the hearing, the prosecutor withdrew the instruction without objection by defense counsel, and with no further request having been made, the instruction was not given.

### 1.      *Applicable Law*

A trial court has a sua sponte duty to give defense instructions supported by substantial evidence and consistent with the defendant's theory of the case. (*People v. Barton*, *supra*, 12 Cal.4th at pp. 194-195; *People v. Baker* (1999) 74 Cal.App.4th 243, 252 (*Baker*).) However, instructions that relate "particular facts to the elements of the offense charged" are pinpoint instructions that a trial court has no sua sponte duty to issue to a jury. (*Barton, supra,* 12 Cal.4th at p. 197.) " 'Such instructions relate particular facts to a legal issue in the case or 'pinpoint' the crux of a defendant's case . . . .' " (*People v. Jennings* (2010) 50 Cal.4th 616, 675.) They are " 'required to be given *upon request when there is evidence supportive of the theory*, but they are not required to be given sua sponte.' " (*Ibid.*, italics added.)

14

"[E]vidence of a hallucination—a perception with no objective reality—is inadmissible to negate malice so as to mitigate murder to voluntary manslaughter but is admissible to negate deliberation and premeditation so as to reduce first degree murder to second degree murder." (*People v. Padilla* (2002) 103 Cal.App.4th 675, 677 (*Padilla* ).) CALCRIM No. 627, which is based on *Padilla,* states: "A hallucination is a perception not based on objective reality.  In other words, a person has a hallucination when that person believes that he or she is seeing or hearing [or otherwise perceiving] something that is not actually present or happening.  [¶]  You may consider evidence of hallucinations, if any, in deciding whether the defendant acted with deliberation and premeditation.  [¶]  The People have the burden of proving beyond a reasonable doubt that the defendant acted with deliberation and premeditation.  If the People have not met this burden, you must find the defendant not guilty of first degree murder."

### 2.	*Analysis*

Defendant contends that the trial court had a sua sponte duty to instruct the jury with CALCRIM No. 627, which would have allowed the jury to consider defendant's alleged hallucinations on the issue of premeditation and deliberation. We disagree.  The California Supreme Court has held that the effect of a defendant's mental disease or disorder on his or her mental state amounts to a pinpoint instruction, which a trial court has no sua sponte duty to provide. (*People v. Ervin* (2000) 22 Cal.4th 48, 91 (*Ervin*); *People v. Saille* (1991) 54 Cal.3d 1103, 1120 (*Saille*) [trial court had no duty to sua sponte instruct on voluntary intoxication to negate premeditation].)  The *Ervin* case is particularly instructive.  In *Ervin,* the defendant was convicted of first degree murder. (*Ervin, supra,* 22 Cal.4th at p. 66.)  The defendant asserted the trial court erred by failing sua sponte to instruct the jury regarding the effect of a mental disease, defect, or disorder on his ability to premeditate and deliberate. (*Id.* at p. 89.)  The California Supreme Court held that instructions regarding the actual effect of the defendant's mental disease or disorder on his mental state and the ability to premeditate and deliberate were instructions "in the nature of pinpoint instructions required to be given only on request." (*Id.* at pp. 90-91.)

15

Here, to the extent defendant maintained that his hallucinations precluded him from manifesting the requisite deliberation and premeditation, he was attempting to raise a doubt regarding the intent element of the crime based on facts particular to his case, rather than raising a defense based on a general principle of law. In other words, "hallucination" is not a general defense, but rather a theory that attempts to negate the intent element of the crime depending upon the individual facts attached to a specific case. Thus, the court did not have a sua sponte duty to instruct with CALCRIM No. 627 without a specific request to do so.

Defendant points out that the bench note to CALCRIM No. 627 states: "The court has a sua sponte duty to give defense instructions supported by substantial evidence and not inconsistent with the defendant's theory of the case. [Citations.]" (Judicial Council of Cal., Crim. Jury Instns. (2014) Bench Notes to CALCRIM No. 627, p. 391, boldface omitted.) As to pattern instructions, it is well recognized that we independently assess whether the instructions correctly state the law, and the legal adequacy of a pattern instruction is reviewed de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1210; *People v. Posey* (2004) 32 Cal.4th 193, 218.) When the correctness of instructions is at issue, an appellate court does not simply defer to the fact that the language was taken from pattern instructions, but instead carefully reviews those instructions to determine whether they correctly state the law. (See, e.g., *People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1179-1199; *People v. Vang* (2009) 171 Cal.App.4th 1120, 1129-1131; *People v. Paysinger* (2009) 174 Cal.App.4th 26, 30.) The same principle should apply to review of the bench notes to a pattern instruction.

The bare assertion in CALCRIM No. 627's bench note, that it is a sua sponte instruction, cites to two cases—*Baker* and *Barton*—which we have already discussed above. (Bench Notes to CALCRIM No. 627 at p. 396.) Notwithstanding the bench note, these cases address a court's general duty to instruct on lesser included offenses and defenses, and they do not address *Padilla* or the concerns discussed in *Ervin* or *Saille.* (*Barton, supra,* 12 Cal.4th at pp. 194-195; *Baker, supra,* 74 Cal.App.4th at p. 252.)

16

Finally, even disregarding for the moment that defendant was required to request the challenged instruction, his argument fails for another, arguably more fundamental reason. Jury instructions, whether they are to be given sua sponte or requested by the parties, must be supported by substantial evidence. (See *People v. Enraca* (2012) 53 Cal.4th 735, 760; *Barton, supra,* 12 Cal.4th at pp. 194-195.) In the instant case, defendant failed to present any evidence, let alone substantial evidence, that he was operating under any hallucinations *at the time* he killed Chu. Rather, only generic references to defendant's paranoia and his belief that "someone" was trying to kill him were mentioned in passing at trial.

Accordingly, on this record, we conclude the trial court did not err in failing to instruct the jury with CALCRIM No. 627, as this instruction was neither requested nor supported by substantial evidence.

## D.     *Prosecutorial Misconduct*

Defendant claims that the prosecutor committed prejudicial misconduct during his closing argument by using an improper analogy to demonstrate premeditation, by telling the jury that evidence of defendant's mental illness was more appropriately considered at the sanity phase of the trial, and by arguing that reasonable doubt had to be based on reason and the evidence. According to defendant, these instances of misconduct lowered the prosecution's burden of proof, which prevented the jury from considering whether the evidence showed beyond a reasonable doubt that he committed first degree murder.

### 1.     *Background*

During his closing argument, the prosecutor explained the law of murder and attempted murder, as well as the doctrines of express and implied malice, malice aforethought, premeditation, and deliberation. With regard to deliberation, the prosecutor argued that defendant had "formed a deadly state of mind," had "determined to kill somebody," and had been "thinking about killing somebody for quite a while." When discussing premeditation, the prosecutor explained: "What is premeditation? It is a cold-blooded killing. That's all. No more, no less. A cold-blooded killing. [¶] Premeditation. You have to think about it for a long time? You have to plan? No. Any

17

killing in cold blood is a killing with premeditation under the law.  [¶]  An example, you are at a picnic.  A mosquito lands on your arm.  You look down, you reach over, you kill that mosquito.  That would be the first degree murder of a mosquito because you killed the mosquito and you just don't care.  That's how much thought you gave it.  You gave it enough thought to form the intent."

Defense counsel did not object to this statement or request an admonition from the trial court.  Instead, during his own closing, defense counsel responded to the mosquito analogy: "The analogy that [the district attorney] gives you is a common one for prosecutors.  They always try to explain premeditation.  And two common analogies is [sic] the mosquito at the picnic or the light switch at the door.  And the analogy it only takes a second.  It takes a second, a moment in time, to turn on the light switch.  But you wanted the lights in the room to come on.  It's the same analogy used all the time.  [¶] The difficulty is you don't know.  You are not there watching the person at the picnic swat the mosquito.  In this case, you don't know what occurred during that time the car pulled up on Lincoln Circle.  You don't have the ability to look inside [defendant's] head."

The prosecutor also suggested that the scant evidence presented of defendant's purported delusions was more relevant at the sanity phase of the trial than at the guilt phase.  He stated that the jury's role in the guilt phase was to "determine what crimes, if any, the defendant committed."  He informed the jury that if they found defendant had committed any crimes, they might be presented with more psychiatric evidence at the sanity phase to determine whether defendant was "not legally responsible for his conduct."  The prosecutor noted that defendant had not offered any actual evidence of his delusions at the guilt phase and discredited the theory that defendant was delusional or drunk when he killed Chu, by pointing out that defendant "wasn't drunk and taking Vicodin when he tried to kill [his cellmate] Lynch."  The prosecutor also explained to the jury that they might be presented with additional evidence at the sanity phase: "Whatever psychiatric explanation there might be for [the shooting], you may hear in a different part of . . . this trial."  "His brother describes him as paranoid and delusional.  Fine.  We will

18

talk about that during the sanity phase if we can talk about it at all. But what he did, what you are to determine in the first phase is first degree murder. That's what he did." "We may get into his state of mind in the second phase of this case. The law doesn't ask you to return a verdict that says, we, the jury, find that [defendant] is a good person or a bad person, or he's mentally ill or he's not mentally ill, or there's an excuse for his behavior or not an excuse for his behavior. [¶] In this phase of the trial, the question posed to you is what did he do." "It can be hard to explain people's behavior. And we may approach that in the second phase of this trial. But right now, you are faced with the naked facts of what this defendant did." "His sanity we may talk about on the basis of mental illness, but it doesn't change the crime."

Defense counsel did not object to these statements, but instead attempted to rebut during his own closing the prosecution's argument regarding consideration of defendant's purported delusions. Specifically, defense counsel countered: "[The prosecution] brings up the sanity phase. It's not your job to decide the sanity phase at this point. But it doesn't relieve you of the obligations . . . You can't simply say, well, this is evidence we are not going to consider till we have the sanity phase. You can't do that. When you took the oath, it's to consider all the evidence."

Defense counsel went on to describe defendant's paranoia on the night of Chu's death, and defendant's fear "that he was going to be killed." He noted that defendant had said "that people were out to kill him," and "that's why he needed to have a gun." Defense counsel argued that there was "no evidence that he planned that night to kill [Chu]," and the defendant's "delusional fear [was] something that you can consider when it goes to premeditation and deliberation."

On rebuttal, the prosecutor discredited the notion that defendant had been laboring under a delusion when he killed Chu, noting that he certainly was "aware enough of his circumstances to drive that car to Millbrae [*sic*], and make up a lie, and leave the body— and, by the way, take . . . Chu's cell phone." He also posed a hypothetical to the jury to explain how they could consider any evidence of mental illness at the guilt phase: "Mr. Najdawi is sitting at the bar, and he's delusional, and he's paranoid, and he's taken

19

drugs, and he's drunk, and he's completely drunk. And in walks a motorcycle police officer and puts his helmet there. And Mr. Najdawi, because he's delusional and drunk and he's taken drugs and he's all messed up, he thinks it would be a good idea to take that helmet and try and steal [] it. [¶] Now he's never going to get away with it. The cop is sitting there. He's drunk. It is stupid. It is not smart. It is irrational, but he does it. He's guilty. He's guilty. He has done the act. He grabs that helmet; he heads for the door; he is guilty of that offense. [¶] It can be the world's worst idea. It can be a product of mental illness . . . . We don't say Mr. Najdawi is a paranoid, alcoholic, drugged up person so he kills people; what do you say we let him go . . . [¶] There are ways in which we handle these things. You decide what he did and then we address the other issue of his mental illness or his mental defense should we get to that stage." Defense counsel did not object to any of these statements.

Finally, the prosecutor told the jury, "[i]f you have a reasonable doubt, it has to be based on reason and the evidence." He also made clear that defendant "has no burden whatsoever to present evidence," but noted that defendant had not refuted the evidence supporting the prosecution's version of events. He argued that, given the defense's access to the prosecution's evidence, "Don't you think if there was a problem with the DNA, you would have heard it, or something the matter with the phone records or the ballistics?" Defense counsel objected to these statements as "shift[ing] the burden," and the trial court sustained the objection. However, defense counsel did not request that the trial court admonish the jury. The prosecutor moved on by telling the jury not to invent its own evidence, but to decide the case based on "what came from the witness stand and the physical exhibits."

At the close of the prosecutor's rebuttal, defense counsel moved for a mistrial or a curative instruction on the basis that "the prosecutor shifted the burden." The prosecutor opposed the motion, arguing that he "did not suggest the defendant was obliged to supply anything." Rather, he merely "called the evidence uncontroverted" and "said explicitly the defendant didn't have to present any evidence but did make it clear they had access to all our files." The prosecutor also pointed out that he "didn't go back to the issue once

20

the court sustained the objection." The trial court denied the motion for a mistrial, stating that by sustaining the objection, "the jury is aware of the fact that no one can argue that the defendant need to produce evidence." The trial court stated that a "further instruction will just probably . . . exacerbate the problem to the extent that there was a problem which was minor to begin with which was cured by the court sustaining the objection." When the mistrial motion was reasserted at a later proceeding, the trial court stated that it "would concur with [the prosecution's] analysis of the distinction between commenting on the defendant's lack of testimony as opposed to the production of for lack of evidence."

    2.    *Applicable Law*

Prosecutorial misconduct is reversible error under the federal Constitution only "when it infects the trial with such unfairness as to make the conviction a denial of due process." (*People v. Morales* (2001) 25 Cal.4th 34, 44.) A prosecutor's conduct that does not render the trial fundamentally unfair is misconduct under California law "only if it involves the use of deceptive or reprehensible methods to attempt to persuade" the trier of fact. (*Ibid.*) "It is improper for the prosecutor to misstate the law generally, and in particular, to attempt to lower the burden of proof." (*People v. Ellison* (2011) 196 Cal.App.4th 1342, 1353.) However, "when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Samayoa* (1997) 15 Ca1.4th 795, 841.) Moreover, " 'a prosecutor is given wide latitude during argument' " (*People v. Wharton* (1991) 53 Cal.3d 522, 567), and appellate courts do not analyze isolated words or phrases, but instead "must view the statements in the context of the argument as a whole" (*People v. Dennis* (1998) 17 Ca1.4th 468, 522). Additionally, "even otherwise prejudicial prosecutorial argument, when made within proper limits in rebuttal to arguments of defense counsel, do not constitute misconduct." (*People v. McDaniel* (1976) 16 Ca1.3d 156, 177.)

To encourage prompt detection and correction of error, courts have held that "lack of a timely and meaningful objection forfeits or waives the claim [on appeal]." (*People*

21

*v. Scott* (1994) 9 Ca1.4th 331, 351.) To preserve a claim of prosecutorial misconduct specifically, the defendant must make a timely objection at trial and request an admonition to the jury. (*People v. Najera* (2006) 138 Cal.App.4th 212, 224.) A defendant is excused from the necessity of objecting and requesting an admonition if either would have been futile. (*Ibid.*)

### 3. *Mosquito Analogy and Comments on Delusions*

Defendant argues that the prosecutor committed misconduct by making the mosquito analogy and by arguing that the jury need not consider defendant's delusions. Defense counsel did not object to these statements and did not seek an admonition. Nevertheless, defendant argues these issues are cognizable on appeal because they involve his fundamental right to due process. Alternately, he urges us to exercise our discretion and reach the merits of these otherwise forfeited claims. He further attempts to avoid forfeiture by claiming that his defense counsel's failure to object below constituted ineffective assistance of counsel. We decline to address the merits of these forfeited claims, and instead proceed to defendant's claim of ineffective assistance of counsel, which we shall discuss *post* at section II.E. of this opinion.

### 4. *Reasonable Doubt Comment*

Defendant contends that the prosecutor committed misconduct during closing argument when he made the following comment regarding reasonable doubt: "If you have a reasonable doubt, it has to be based on reason and the evidence." The prosecutor further argued that defense counsel "has no burden whatsoever to present evidence. And P.S. he hasn't got any . . .[¶] . . . Don't you think if there was a problem [with the state's evidence] . . . you would have heard about it." Defense counsel objected, arguing that the prosecutor was shifting the burden; the trial court sustained the objection, but did not issue a curative instruction. The prosecutor continued, "The evidence in this case is uncontroverted. And I respectfully suggest that you not invent evidence of your own. You go with what came from the witness stand and the physical exhibits. [¶] What are the elements of second degree murder? A person is killed intentionally. Period. The end. Unlawfully. [¶] There's no doubt about that in this case whatsoever. And [defense

counsel] . . . conceded that his client is guilty of second [degree murder]. [¶] The evidence of first degree murder is premeditation. That is an issue you will consider. But please consider all of the evidence taken together . . . ."

Defendant claims that by these comments, the prosecutor misstated the law regarding reasonable doubt, and that the trial court erred by failing to issue a curative instruction and/or denying his request for a mistrial based on these comments. We disagree. First, we doubt that in context, these statements by the prosecutor, which were raised in his final closing argument, was misconduct rather than a fair response to defense counsel's argument, which urged the jury to find reasonable doubt on the issue of premeditation and deliberation based on the lack of affirmative evidence that defendant said he was going to kill someone. Viewed in the context of the argument as a whole, "there is [not] a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Berryman* (1993) 6 Cal.4th 1048, 1072, disapproved on other grounds, *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 (*Hill*).)

Second, we cannot agree with defendant that the above-quoted remark is similar to one found improper by our Supreme Court in *Hill, supra,* 17 Cal.4th 800. In *Hill,* the prosecutor improperly shifted the burden of proof to the defendant when she explained reasonable doubt to the jury as follows: " '[I]t must be reasonable. It's not all possible doubt. Actually, very simply, it means, you know, you have to have a reason for this doubt. *There has to be some evidence on which to base a doubt.*' . . . 'There must be *some evidence* from which there is a reason for a doubt. You can't say, well, one of the attorneys said so.' (Italics added.)" (*Hill, supra,* 17 Cal.4th at p. 831.) The California Supreme Court explained that "to the extent [the prosecutor] was claiming there must be some affirmative evidence demonstrating a reasonable doubt, she was mistaken as to the law, for the jury may simply not be persuaded by the prosecution's evidence. [Citation.] On the other hand, [the prosecutor] may simply have been exhorting the jury to consider the evidence presented, and not attorney argument, before making up its mind." (*Hill, supra,* 17 Cal.4th at pp. 831-832.) The Supreme Court said the question was arguably

23

close, but it concluded it was reasonably likely that the jury understood the comments "to mean defendant had the burden of producing evidence to demonstrate a reasonable doubt of his guilt." (*Id.* at p. 832.) The Supreme Court reversed the verdict in *Hill,* but it did so based upon "the many acts of prosecutorial misconduct and other errors that plagued that trial." (*People v. Booker* (2011) 51 Cal.4th 141, 186.)

Unlike *Hill,* this case was not plagued with multiple acts of prosecutorial misconduct, and the prosecutor was not trying to explain to the jury the concept of reasonable doubt. Rather, the prosecutor commented on the weakness of the evidence to support the defense theory that defendant was delusional and irrational. He also exhorted the jury to consider the evidence as a whole, and affirmatively stated that the defense had no burden to produce any evidence. There was no risk that the jury would construe the prosecutor's challenged remarks to mean defendant had the burden of proving reasonable doubt. "A distinction clearly exists between the permissible comment that a defendant has not produced any evidence, and on the other hand an improper statement that a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1340.)

Finally, the trial court clearly instructed the jury that the burden of proof rested with the prosecution (CALCRIM No. 220), and that the jury must follow its instructions, not the attorneys' comments on the law (CALCRIM No. 200). It also properly instructed the jury on the use of circumstantial evidence, advising the jurors that "when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable." (CALCRIM No. 224.) Considering the record as a whole, it is not reasonably likely the jury construed the prosecutor's argument to mean defendant had the burden of producing evidence to demonstrate a reasonable doubt. Under the circumstances, defendant's claim of prosecutorial misconduct lacks merit.

### E.     *Ineffective Assistance of Counsel*

Defendant next claims that defense counsel rendered ineffective assistance of counsel by failing to object to alleged prosecutorial misconduct and by failing to request certain jury instructions.

To prevail on a constitutional claim of ineffective assistance of counsel on appeal, defendant has the burden of proving two things. First, defendant must show that his counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness under prevailing professional norms. Second, defendant must show his counsel's deficient representation subjected the defense to prejudice, i.e., that there is a reasonable probability that but for counsel's failings, the result would have been more favorable. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 694 (*Strickland*).)

" 'Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." ' [Citations.] '[W]e accord great deference to counsel's tactical decisions' [citation], and we have explained that 'courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight' [citation]." (*People v. Weaver* (2001) 26 Cal.4th 876, 925-926.) If the record on appeal sheds no light on why trial counsel acted or failed to act in the manner challenged, an ineffective assistance claim must be rejected unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation. (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1219; *People v. Pope* (1979) 23 Cal.3d 412, 426.)

*1.      Failure to Object to Alleged Prosecutorial Misconduct*

Defendant argues that the prosecutor's mosquito analogy trivialized the concept of premeditation, which had to be proven beyond a reasonable doubt. According to defendant, "[t]he basic premise of the prosecutor's argument was that premeditation was proven beyond a reasonable doubt if it were shown that [he] exercised the same thought process as a person brushing a mosquito off his arm." Defendant further claims that the prosecutor's comments that to the jury that it should only consider evidence of mental illness, paranoia, and delusions at the sanity phase "effectively removed from the jury's consideration" whether defendant's paranoia and delusions "tended to negate premeditation and deliberation."

25

Defense counsel affirmatively chose to address the comments in the prosecutor's initial closing argument in defendant's closing argument. Such a choice was a reasonable tactical decision. It is a common and acceptable strategy to allow opposing counsel's argument to proceed uninterrupted, perhaps to avoid antagonizing the jury, and then to address objectionable matters in responding argument. (*People v. Plasencia* (1985) 168 Cal.App.3d 546, 556.)

Defendant, however, criticizes his counsel's choice, arguing that counsel's failure to object did not inure to his benefit. We do not accept defendant's criticism. Defense counsel's argument clearly distinguished defendant's situation from the district attorney's mosquito analogy by stating, "[t]he difficulty is you don't know. You are not there watching the person at the picnic swat the mosquito. In this case, you don't know what occurred during that time the car pulled up on Lincoln Circle. You don't have the ability to look inside [defendant's] head." Similarly, defense counsel responded to the prosecutor's suggestion that evidence of defendant's mental illness should be considered at the sanity phase by describing defendant's general paranoia and fear on the night of Chu's death, and argued that defendant's "delusional fear or not is something that you can consider when it goes to premeditation and deliberation."

We find no fault with defense counsel's tactical choice of dismissing the mosquito analogy and focusing the jury's attention to defendant's particular thought process. The argument had the positive effect of requiring the prosecutor to respond in his final closing argument with a discussion of how the jury could consider evidence of defendant's mental illness at the guilt phase. We find defense counsel's performance was not deficient.

Similarly, the prosecutor's repeated statements that the jury was charged at the guilt phase only with determining whether he committed the elements of the charged crimes, while reserving the issue of sanity for a later phase, was not necessarily in error, and the trial court might not have sustained such an objection. As discussed, defense counsel dismissed the mosquito analogy and exhorted the jury to consider all of the

26

evidence, including defendant's "delusional fear[s]," at the guilt phase in determining whether he acted with premeditation and deliberation.

Accordingly, we conclude defense counsel's failure to object to the prosecutor's comments was not objectively unreasonable under the circumstances. In other words, counsel's representation was not deficient.

### 2. *Failure to Request Certain Jury Instructions*

Defendant next claims that his trial counsel was ineffective by failing to request jury instructions that would have provided a legal basis for finding that he did not commit first degree murder. According to defendant, trial counsel should have requested instructions that the jury could consider defendant's delusions (CALCRIM No. 627), any acts of provocation (CALCRIM No. 522), which he asserts would not have to be reasonable, but could be "viewed through the prism of his paranoid delusions," and a manslaughter instruction based on *Garcia, supra,* 162 Cal.App.4th 18. He further contends defense counsel was deficient in failing to request a modification of the definition of malice aforethought (CALCRIM No. 520), so as to reference his claim of imperfect self-defense (CALCRIM No. 571).

We find no fault with defense counsel's failure to seek the challenged jury instructions. Here, based on the scant evidence of defendant's delusions and the complete lack of evidence regarding any provocative acts by the victim, defense counsel made a reasonable and tactical decision to not request CALCRIM Nos. 522 and 627. Inasmuch as defendant did not testify that Chu provoked him, and no other evidence was presented at trial showing that defendant misperceived Chu as a threat in the car as a result of his delusions, the trial court would likely have denied defendant's requests for CALCRIM Nos. 522 and 627 as not supported by substantial evidence.

Similarly, it appears that defense counsel had tactical reasons for not requesting a modification of the definition of malice to add a reference to defendant's imperfect self-defense theory, which cannot be based on delusions alone (*Elmore, supra,* 59 Cal.4th at pp. 135-137) and for not requesting a manslaughter instruction based on a theory that had no legal basis (*Bryant, supra,* 56 Cal.4th at p. 970). Defendant has failed to carry his

27

burden of disproving that defense "counsel had no such tactical purpose." (*People v. Jones* (2003) 30 Cal.4th 1084, 1122.)

   3.   *No Resulting Prejudice*

Even assuming arguendo that defendant was able to demonstrate deficient performance on the part of defense counsel, he has not demonstrated that "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland, supra,* 466 U.S. at pp. 687-688, 694.)

To begin, the evidence supporting the verdict was substantial, and no evidence was presented showing that defendant believed Chu posed a threat when defendant shot him 11 times in the head. Any prejudicial impact of the prosecutor's argument was minimized through defense counsel's effective response during his own closing.

Similarly, there was little prejudicial effect from the trial court's failure to instruct with CALCRIM Nos. 522 and 627 because, though the jury would have been instructed to consider Chu's real or imagined provocatory conduct toward defendant, no such evidence whatsoever was presented at trial. Moreover, the trial court properly and fully instructed the jury on the meaning of malice aforethought (CALCRIM No. 520), on the mental state required for deliberate and premeditated murder (CALCRIM No. 521), on unpremeditated murder in the second degree (CALCRIM No. 520), on the jury's duty if it found a reasonable doubt as to the degree of murder (CALCRIM No. 521), on the effect of voluntary intoxication on homicide crimes (CALCRIM No. 625), on the insufficiency, by itself, of multiple acts of violence to establish premeditation and deliberation (Special Jury Instruction No. 1), and that the jury must accept and apply the law as the court states it, not as the attorneys state it (CALCRIM No. 222). "[T]he jury is presumed to consist of intelligent persons who are fully able to understand, correlate and follow the instructions given to them." (*People v. Archer* (1989) 215 Cal.App.3d 197, 204.) Absent evidence to the contrary, and there is none here, it is presumed that the jury understood and correctly applied those instructions. (*People v. Talhelm* (2000) 85 Cal.App.4th 400, 409.)

28

Finally, the parties' arguments, taken as a whole, and the trial court's instructions, adequately informed the jury of the legal principles relevant to the case. For these reasons, defendant has not demonstrated a reasonable probability that he would have been acquitted of first degree murder absent defense counsel's alleged errors.

Accordingly, because trial counsel's performance did not fall outside the wide range of professionally competent assistance and did not prejudice defendant, his claim of ineffective assistance of counsel necessarily fails.

## F.    *Cumulative Error*

Because we reject each of defendant's claims of error, we also reject his claim that cumulative error requires reversal. (See *People v. Smithey* (1999) 20 Cal.4th 936, 1007.)

## G.    *Sentencing*

Defendant contends that the abstract of judgment erroneously states that he was sentenced to a consecutive, rather than a concurrent term on the gun charges (§ 12021,[3] subd. (c)(1) (count 2)) and that his conviction for this offense was invalid because his prior, qualifying offense was not among the misdemeanors enumerated in the statute. While defendant is correct that the abstract of judgment should be modified, his claim as to the validity of his conviction is not cognizable on appeal.

*1. Background*

In addition to the murder and attempted murder charges, defendant was charged with violations of section 12021, subdivisions (c) and (d) and four counts of credit card fraud. Section 12021, subdivision (c)(1) prohibits an individual who has been convicted of certain enumerated California misdemeanors from possessing a firearm, and section 12021, subdivision (d)(1) criminalizes possession of a firearm where such possession is prohibited by an express condition of his or her probation. The indictment alleged that defendant was prohibited from possessing a firearm due to his May 28, 2008, conviction in Nevada for a violation of Nevada Code NRS 202.290, aiming a firearm at a human

---

[3]    Section 12021, subdivision (c)(1) was repealed, effective January 1, 2012, and renumbered section 29805 without any substantive change. (Cal. Law Revision Com. com., 51D (Pt.4) West's Ann. Pen. Code (2012 ed.) foll. § 29805, p. 237.)

29

being or discharging a weapon where a person might be endangered, "a misdemeanor equivalent to [ ] Penal Code section 246.3."

On November 29, 2011, defendant pleaded no contest to the two firearm possession counts for "strategic" reasons. At that same hearing, the prosecutor moved to dismiss the four fraud-related counts.[4]

On May 10, 2012, after defendant had been convicted by the jury on the remaining charges, the trial court sentenced defendant. According to the reporter's transcript, the trial court sentenced defendant to "a consecutive midterm sentence of seven years" on the attempted murder charge, which would precede a "50-year to life sentence" on the murder charge and gun enhancement. As to the gun charges, the trial court sentenced defendant to "a two-year midterm concurrent" term as to the section 12021, subdivision (c)(1) count, with the section 12021, subdivision (d)(1) count stayed pursuant to section 654.

The clerk's minutes also indicate that the trial court imposed a consecutive seven year term on the attempted murder charge, a two year concurrent term on the section 12021, subdivision (c)(1) charge, and a 50 year-to-life term on the murder charge and gun enhancement. However, the clerk's minutes also state, "Defendant is committed to Department of Corrections for 50 years to life plus *7 months*." (Italics added.)

Finally, the abstract of judgment indicates that the trial court sentenced defendant to a seven-year consecutive term on the attempted murder charge, a two-year four-month consecutive term on the section 12021, subdivision (c)(1) count, and a 50 year-to-life term on the murder charge with the gun enhancement. The abstract of judgment lists a

---

4   Contrary to the Attorney General's assertion on appeal, we find nothing in the record supporting the contention that defendant pleaded no contest to the gun charges in exchange for the dismissal of the credit card charges. Rather, the record reflects that defendant first announced his desire to plead to the gun charges on November 15, 2011. However, due to apparent calendaring issues, the matter was not actually heard until November 29, 2012, the same date the prosecutor first indicated the possibility of dismissing the fraud-related charges.

"total time on attached pages" of nine years four months and a "total time" of 50 years to life plus *7 months*.

## 2. *The Abstract of Judgment*

"Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls." (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385.) Moreover, an unauthorized sentence is subject to correction at any time. (*People v. Dotson* (1997) 16 Cal.4th 547, 554, fn. 6.) Here, as the Attorney General concedes, the reporter's transcript, clerk's transcript, and abstract of judgment all conflict with one another. Instead of an aggregate term of 50 years to life, plus 7 months, the intended sentence was obviously 50 years to life, plus 7 years determinate. Because there is no reason to suspect that the reporter's transcript is incomplete or incorrect, and in fact, the sentence memorialized therein provides the most logical sentence, we find the reporter's transcript controlling and modify the abstract of judgment accordingly. The reporter's transcript clearly states that the trial court sentenced defendant to a seven year term on the attempted murder charge and a two year *concurrent* term for the section 12021, subdivision (c)(1) charge (for a total determinate term of seven years), with a 50 year-to-life term for the murder charge and gun enhancement (for a total indeterminate term of 50 years to life). We shall order the abstract of judgment be modified accordingly.

## 3. *Validity of Conviction*

Defendant next attempts to contest the validity of his conviction for firearm possession. He argues that his misdemeanor conviction for a prior Nevada gun offense was not a qualifying offense under section 12021, subdivision (c)(1), which pertains only to California crimes. Although acknowledging that section 12021, subdivision (c)(1) would not apply to defendant's out-of-state misdemeanor conviction (see *People v. Delacy* (2011) 192 Cal.App.4th 1481, 1493), the Attorney General, nevertheless, argues that defendant's claim must fail, as it is not cognizable on appeal. We agree.

Generally speaking, under section 1237.5, a defendant may not bring an appeal from a judgment of conviction entered after a guilty or no contest plea unless he or she

31

has first obtained from the superior court a certificate of probable cause. (*People v. Mendez* (1999) 19 Cal.4th 1084, 1095 (*Mendez*). "A defendant who has pleaded guilty or nolo contendere, however, need not file a written statement or obtain a certificate of probable cause if the appeal is based on the following grounds: '(A) The denial of a motion to suppress evidence under . . . section 1538.5; or [¶] (B) Grounds that arose after entry of the plea and do not affect the plea's validity.' ([Cal. Rules of Court, rule] 8.304(b)(4); see also . . . *Mendez* [*, supra,*] 19 Cal.4th [at p.]1099 . . . .) Defendant here does not base his appeal on either noncertificate ground." (*People v. Maultsby* (2012) 53 Cal.4th 296, 299, fn. 2 (*Maultsby*).) "The purpose of section 1237.5 is 'to weed out frivolous and vexatious appeals from pleas of guilty or no contest, before clerical and judicial resources are wasted.' (*People v. Buttram* (2003) 30 Cal.4th 773, 790; see *Mendez, supra,* 19 Cal.4th at p. 1095 [§ 1237.5 'is procedural in nature'].)" (*Maultsby, supra,* 53 Cal.4th at p. 299.)

Defendant maintains that he was not required to obtain a certificate of probable cause under section 1237.5 because his no contest plea was "ancillary" to the charges that he took to trial. Relying on *Maultsby, supra,* 53 Cal.4th 296, defendant asserts that "there is no efficiency to be gained in requiring a certificate of probable cause when a single judgment is based [on] convictions that combine guilty pleas and jury trial convictions . . . ." Defendant's reliance on *Maultsby* is misplaced, as this case supports our conclusion that a certificate of probable cause was required in the instant case.

In *Maultsby*, our Supreme Court addressed the issue of whether a defendant who was convicted by a jury of a petty theft offense, but who had admitted a prior felony conviction was required to obtain a certificate of probable cause to pursue an appeal limited to his admission of the prior conviction. (*Maultsby, supra,* 53 Cal.4th at p. 298.) Under these circumstances, the court concluded that section 1237.5 did not apply. (*Ibid.*) The court explained that the "Legislature has distinguished between pleas, such as guilty, not guilty, or nolo contendere[], and admissions to sentencing allegations." (*Id.* at p. 299.) The court reasoned that in light of this distinction, together with the limited application of section 1237.5 to only convictions based on a "plea of guilty or nolo

32

contendere," the necessary implication was that the certificate of probable cause requirement was not intended to apply to an admission of a sentencing enhancement allegation. (*Id.* at pp. 299-300.) Thus, based on its plain language, the court concluded that section 1237.5 "does not apply to an appeal where a defendant does not plead guilty or nolo contendere." (*Id.* at p. 300, fn. omitted.)

Here, however, defendant *pleaded no contest* to the section 12021, subdivision (c)(1) charge, and thus his appeal falls plainly within the purview of section 1237.5. Defendant misreads *Maultsby* to the extent he claims that section 1237.5 should not apply where, as here, a defendant pleads guilty to some charges but takes others to trial. Nothing in *Maultsby* stands for the proposition that a defendant who goes to trial on some counts, but who enters guilty or no contest pleas on others is able to bypass the gatekeeping provisions of section 1237.5. Moreover, here, unlike in *Maultsby*, defendant pleaded no contest to a substantive offense. "This factual circumstance alone triggers section 1237.5's requirement that a defendant obtain a certificate of probable cause. [Citations.]" (*Maultsby, supra,* 53 Cal.4th at p. 302.)

Accordingly, we conclude that defendant's challenge to his section 12021, subdivision (c)(1) conviction is barred in the absence of a certificate of probable cause.

## III. DISPOSITION

The abstract of judgment and minute order are corrected to reflect the following: 1) the sentence of a two-year concurrent term for count 2 ( § 12021, subd. (c)(1); 2) the consecutive sentence of a determinate term of seven years for count 8 (§ § 664 & 187, subd. (a)), which shall precede the indeterminate term of 50 years-to-life for count 1 (§ 187, subd. (a).) The superior court clerk is directed to prepare and forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation. As so modified, the judgment is affirmed.

_____
REARDON, J.

We concur:


_____
RUVOLO, P. J.


_____
RIVERA, J.